

**FILED & ENTERED**

**FEB 01 2017**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY gonzalez  DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re:    Harry Roussos, Debtor<br><br>In re:    Theodosios Roussos, Debtor<br>(jointly administered) | Case Nos.:  2:15-bk-21624-ER and<br>2:15-bk-21626-ER (jointly administered)<br>Chapter:  7<br><br>**MEMORANDUM OF DECISION DENYING MOTION FOR STAY PENDING APPEAL**<br><br>[No hearing required pursuant to Federal Rule of Civil Procedure 78(b) and Local Bankruptcy Rule 9013-1(j)(3)] |

   Before the Court is a motion for stay pending appeal of orders (1) approving a settlement agreement and (2) finding that the settlement agreement was entered into in good faith, within the meaning of California Code of Civil Procedure §877.6. For the reasons set forth below, the motion is DENIED.

**Facts**[1]

This litigation stems from the Chapter 7 Trustee's ("Trustee") attempt to recover, on behalf of the estates of Harry and Theodosios Roussos (the "Roussos Brothers"), a (1) 20-unit apartment building located at 2727–2741 Abbot Kinney Boulevard, Venice, CA ("Abbot Kinney Property") and (2) a 30-unit building located at 153 San Vicente Boulevard, Santa Monica, CA ("San Vicente Property") (collectively, the "Properties").

The Roussos Brothers commenced voluntary Chapter 11 petitions on June 14, 1993. The cases were jointly administered. On August 5, 1994, the Bankruptcy Court entered an order ("Sale Order") approving the sale of the Abbot Kinney Property to O.F. Enterprises, LP ("OF"), and approving the sale of the San Vicente Property to S.M.B. Investors Associates, LP ("SMB"). On October 19, 1994, the Roussos Brothers executed a grant deed conveying title to the Abbott Kinney Property to OF. On November 29, 1994, the Roussos Brothers executed a grand deed conveying title to the San Vicente Property to SMB. The Roussos Brothers' Chapter 11 cases were converted to Chapter 7 on May 2, 1995.[2] Both Harry and Theodosios received discharges on January 2, 1996.[3] The cases were closed on June 27, 2002.

On July 23, 2015, the cases were reopened upon the motion of the United States Trustee. On August 4, 2015, the Trustee filed two complaints, both of which seek to recover the Properties. The complaints are identical; one was filed in Harry's Chapter 7 case (Adv. No. 2:15-ap-01406-ER), the other in Theodosios' Chapter 7 case (Adv. No. 2:15-ap-01404-ER). Throughout the prosecution of this litigation, the motions filed and the orders entered in each adversary proceeding have been identical.[4]

The complaints were filed against Harry Roussos, Christine Roussos (Harry's spouse), Theodosios Roussos, Paula Roussos (Theodosios' spouse, who passed away in December 2016), OF, Liro, Inc. (the general partner of OF), SMB, SMB Management, Inc. (the general partner of SMB), Chase Bank, N.A., and CIT Bank, N.A. (formerly known as OneWest Bank, N.A.). The complaints alleged that the Roussos Brothers procured the 1994 Sale Order by committing fraud on the court, and sought to invalidate the Sale Order so that title to the Properties would be revested in the Roussos Brothers' bankruptcy estates. Specifically, the complaints alleged that to obtain the Sale Order, the Roussos Brothers submitted to the Bankruptcy Court declarations

---

[1] The Court reviewed the following papers in adjudicating this matter:
  1) Emergency Motion of Theodosios Roussos for Stay Pending Appeal [Doc. No. 677];
  2) Objection to the Emergency Motion of Theodosios Roussos for Stay Pending Appeal [filed by Harry and Christine Roussos] [Doc. No. 695];
  3) Chapter 7 Trustee's Opposition to Emergency Motion of Theodosios Roussos for Stay Pending Appeal [Doc. No. 698]; and
  4) Reply of Theodosios Roussos in Support of Motion for Stay Pending Appeal [Doc. No. 713].

[2] *See* Doc. No. 34, Case No. 2:15-bk-21624-ER (order denying confirmation of Harry and Theodosios' joint consolidated second amended plan of reorganization and converting the cases to chapter 7); Doc. No. 12, Case No. 2:15-bk-21626-ER (same order in Theodosios' jointly-administered case).

[3] *See* Doc. No. 101, Case No. 2:15-bk-21624-ER (discharge of Harry); Doc. No. 48, Case No. 2:15-bk-21626-ER (discharge of Theodosios).

[4] The Court refers to orders entered in the adversary proceedings in the singular. Citations to the adversary docket are to Adv. No. 2:15-ap-01406-ER.

falsely stating that the sale was at arms length and that they had no interest in the purchaser entities OF and SMB, when in fact the Roussos Brothers secretly controlled OF and SMB.

On October 9, 2015, the Court imposed a temporary ninety-day stay of an arbitration action captioned *Harry Roussos and Christine Roussos v. Theodosios Roussos and Paula Roussos* ("Arbitration"). *See* Doc. No. 424.[5] The Arbitration, which was being conducted by Judge Shook, involved a dispute over the management and ownership of the Properties. The Court stayed the Arbitration to the extent that it affected, directly or indirectly, title to or ownership of the Properties. On December 21, 2015, the Court entered a preliminary injunction which continued indefinitely the previously-ordered stay of the Arbitration. *See* Doc. No. 92, Adv. No. 2:15-ap-01406-ER ("Preliminary Injunction Order"). Theodosios appealed the Preliminary Injunction Order; on June 27, 2016, the District Court affirmed the issuance of the preliminary injunction. *See* Doc. No. 318, Adv. No. 2:15-ap-01406-ER. Theodosios appealed the District Court's affirmance of the preliminary injunction to the Ninth Circuit. On January 4, 2017, after the Court had approved an agreement settling the litigation, the Ninth Circuit dismissed Theodosios' appeal of the Preliminary Injunction Order as moot. *See* Doc. No. 436, Adv. No. 2:15-ap-01406-ER.

On May 25, 2016, the Court entered an order permitting Judge Shook, who was conducting the Arbitration stayed by the Preliminary Injunction Order, to appoint a director to manage the affairs of OF, Liro, SMB, and SMB Management (collectively, the "Four Entities"). *See* Doc. 551. Shortly thereafter, Judge Shook appointed Sarah Daily as the managing director of the Four Entities.

On October 6, 2016, the Court approved a settlement agreement ("Settlement Agreement") between the Trustee, the Four Entities, and Harry and Christine Roussos (collectively, the "Settling Defendants"). *See* Order Approving Settlement Agreement ("Settlement Approval Order") [Doc. No. 591]. Though not a party to the litigation, Lula Michaelides ("Michaelides"), who holds non-dischargeable judgments against the Roussos Brothers, was a party to the Settlement Agreement. The Trustee offered to Theodosios and Paula Roussos the same settlement terms as those extended to Harry and Christine Roussos, but Theodosios and Paula declined to enter into the Settlement Agreement. On October 7, 2016, the Court entered stipulated judgments ("Property Judgments") that were contemplated by the Settlement Agreement in each of the adversary proceedings.[6] Among other things, the Property Judgments provide that:
1) The 1994 Sale Order is void *ab initio* and of no force and effect and is vacated;
2) Title to each of the Properties reverts back to the way it was immediately prior to entry of the Sale Order without the need for a further grant deed;
3) The Properties are properties of the Roussos Brothers' estates;
4) The grant deeds conveying title from the Roussos Brothers to the respective buyers and any other instruments recorded in connection with the aforesaid instruments are deemed canceled;
5) None of the defendants (whether they were parties to the Settlement Agreement or not) are prevailing parties for purposes of Bankruptcy Rule 7054 or otherwise;
6) Each party shall bear its own attorneys' fees and costs; and

---

[5] Unless otherwise indicated, all docket citations are to the main bankruptcy case, Case No. 2:15-bk-21624-ER.

[6] *See* Doc. No. 405, Adv. No. 2:15-ap-01406-ER; Doc. No. 429, Adv. No. 2:15-ap-01404-ER.

7) The Preliminary Injunction Order entered by the Court on December 21, 2015, enjoining private arbitration between Harry and Theodosios "to the extent it affects, directly or indirectly, title to, or ownership of" the Properties is vacated.

The material terms of the Settlement Agreement are as follows:
1) In full satisfaction of the Trustee's claims against the Four Entities and Harry and Christine Roussos, the Trustee will accept a payment of $11 million ("Settlement Amount"). The Settlement Amount shall be paid from the proceeds of the Trustee's sale of the San Vicente Property and, if necessary, the Abbot Kinney Property.
2) Sale proceeds of the San Vicente Property shall be distributed first to pay the costs of sale, second to satisfy liens against the San Vicente Property, third to satisfy tax liabilities, and fourth to pay the Settlement Amount. Remaining proceeds shall be distributed to Harry and Theodosios,[7] *pari passu*, as follows:
   a) $1.5 million to Harry out of the Harry Estate pursuant to Bankruptcy Code §726(a)(6); and
   b) $1.5 million to Theodosios out of the Theodosios Estate pursuant to Bankruptcy Code §726(a)(6).
3) Michaelides holds a Non-Dischargeable Judgment against Harry and Theodosios. If Harry and Christine support approval of the Settlement Agreement, waive any right to object to Michaelides' claims, and take no action to remove Sarah Daly as director of the Four Entities, Michaelides will limit collection of the Non-Dischargeable Judgment to any monies distributed to her in the Roussos Cases on account of any claims that she may file, except Michaelides will not levy on the $1.5 million distribution to Harry referred to in ¶2a. If Theodosios and Paula support approval of the Settlement Agreement, waive any right to object to Michaelides' claims, and take no action to remove Sarah Daly as director of the Four Entities, Michaelides will limit collection of the Non-Dischargeable Judgment to any monies distributed to her in the Roussos Cases on account of any claims that she may file, except Michaelides will not levy on the $1.5 million distribution to Theodosios referred to in ¶2b.
4) Upon entry of the Property Judgments, Michaelides releases the Settling Defendants and Theodosios and Paula of all claims and causes of action, except that Michaelides may (a) file a proof of claim in the Theodosios Case or Harry Case, and receive a distribution on any allowed claim; and (b) enforce the Non-Dischargeable Judgment against any distributions made to Harry and/or Theodosios pursuant to §726 (other than the distributions referred to in ¶2, provided that Harry and Christine and/or Theodosios and Paula support the Settlement Agreement as described in ¶3). However, the release shall not apply to any defendants who oppose approval of the Settlement Agreement, object to any claim Michaelides may file, attempt to remove Sarah Daley as director of the Four Entities, or appeal the Property Judgments.
5) The release described in ¶4 releases the Four Entities from any liability to Michaelides under the Non-Dischargeable Judgment under a theory that the Four Entities are alter-egos of Harry and Theodosios.

---

[7] Given names are used to distinguish Theodosios Roussos from Harry Roussos. No disrespect is intended.

    The Court approved the Settlement Agreement over various objections asserted by Theodosios. First, the Court rejected Theodosios' argument that Sarah Daly lacked the authority to sign the Settlement Agreement on behalf of the Four Entities:

> In his order appointing Ms. Daly as the managing director, Judge Shook incorporated by reference this Court's Management Order, explaining that the Management Order set forth the scope of Ms. Daly's authority. This Court has the ability to interpret its Management Order, and therefore determine whether Ms. Daly had authority to enter into the Settlement Agreement. The Management Order provides that Ms. Daly has the authority to "manage the affairs" of the Four Entities. The Management Order specifies that Ms. Daly's responsibilities include hiring and paying counsel to represent the Four Entities. The Court finds that the Management Order bestows upon Ms. Daly the authority to enter into the Settlement Agreement. Ms. Daly's authority to "manage the affairs" of the Four Entities necessarily includes the authority to settle litigation in which the Four Entities are involved. Ms. Daly's authority to settle is reinforced by the Management Order's provisions permitting Ms. Daly to hire counsel to represent the Four Entities. The authority to hire counsel would be ineffectual if it did not also include the authority to direct counsel to either settle or continue to defend against the Trustee's litigation.

Memorandum of Decision Granting Emergency Motion to Approve Settlement Agreement ("Memorandum of Decision") [Doc. No. 590] at 10.

    Second, the Court rejected Theodosios' argument that the Settlement Agreement was void because it provided for the sale of the Properties in contravention of the partnership agreements of OF and SMB. The Court explained that Theodosios' argument neglected to take account of the effects of the Statement of Decision and Judgment in Binding Arbitration ("Arbitrator's Decision") issued by Judge Shook:

> The Arbitrator's Decision directs that the Properties are to be marketed and sold, and specifies that this sale is to occur even if the voting requirements of the Partnership Agreements are not satisfied. Although the Arbitrator's Decision has not been confirmed by the Superior Court, California Code of Civil Procedure §1287.6 provides that an arbitration decision "that has not been confirmed or vacated has the same force and effect as a contract in writing between the parties to the arbitration." Therefore, the previous contractual provisions of the Partnership Agreement have been superseded by the Arbitrator's Decision. Consequently, Theodosios' contractual rights to disapprove the sale of the Properties have been eliminated. While the Arbitrator's Decision is presently stayed, that stay will be removed once the Court vacates the [Preliminary Injunction Order].

*Id.*

    Third, the Court rejected Theodosios' contention that the Settlement Agreement was not entered into at arms-length:

> Theodosios contends that Mr. Lesnick, counsel to the Four Entities, is conflicted, and that consequently, the Settlement Agreement negotiated on the Four Entities' behalf by Mr. Lesnick is not at arms-length. At the hearing, Theodosios claimed that Mr. Lesnick was referred to Ms. Daly by the Trustee, Mr. Ehrenberg. As further evidence of the alleged conflict, Theodosios pointed to the fact that Mr. Lesnick has represented Mr. Ehrenberg in other adversary proceedings.

> The Court finds that there is no evidence of any impropriety by Mr. Lesnick.[8] At the hearing, Jonathan Shenson, counsel for Harry and Christine Roussos, explained that it was he who introduced Mr. Lesnick to Ms. Daly. Commencing in 2014, Mr. Lesnick represented Trustee Ehrenberg, as special litigation counsel on a contingency basis, in twenty-one fraudulent transfer proceedings, all filed in the same case, Mirage Bottling Group (2:12-bk-35770-ER). Mr. Lesnick's representation of the Trustee in unrelated fraudulent transfer actions in one bankruptcy case is not a conflict. In sum, Theodosios' unsubstantiated accusations are nothing more than a further manifestation of his dissatisfaction with Ms. Daly's decision to employ Mr. Lesnick as counsel for the Four Entities.

*Id.* at 11.

Finally, the Court rejected Theodosios' assertion that the Four Entities lacked the capacity to enter into the Settlement Agreement. The Court found that if a corporation had been suspended for failure to meet its tax obligations, that corporation "shall not be entitled to sell, transfer, or exchange real property in California during the period of forfeiture or suspension." California Revenue and Taxation Code §23302(d). The Court noted that while Liro and SMB Management had been suspended for failure to meet tax obligations, OF and SMB—the corporations which held title to the Properties—had not been suspended. As a result, the Court concluded that OF and SMB were not barred from transferring the Properties by California Revenue and Taxation Code §23302(d).

With respect to suspended corporations Liro and SMB Management, the Court acknowledged that a corporation that has been suspended is "disabled from participating in any litigation activities." *Palm Valley Homeowners Ass'n, Inc. v. Design MTC*, 85 Cal. App. 4th 553, 560, 102 Cal. Rptr. 2d 350, 355 (Cal. 2000). However, the Court also observed that "lack of capacity is not a jurisdictional defect and is waived if not properly raised." *Ctr. for Self-Improvement & Cmty. Dev. v. Lennar Corp.*, 173 Cal. App. 4th 1543, 1552–53, 94 Cal. Rptr. 3d 74, 80 (2009). The Court determined that the right of Theodosios—or of any party to the litigation—to contest the capacity of Liro and SMB Management to participate in the litigation had long since been waived. The Court noted that Liro and SMB Management had actively participated in the litigation for more than one year, and that no party had raised the issue of their suspension.[9] The Court found that despite this active participation, Theodosios failed to timely raise the issue of Liro and SMB Management's capacity:

> Theodosios did not challenge Liro and SMB Management's capacity on October 9, 2015, when Liro and SMB Management filed a motion to dismiss raising the same

---

[8] As evidence of Mr. Lesnick's alleged conflict, Theodosios stated that "Sarah Daly informed me that she met Matt Lesnick through Trustee Howard M. Ehrenberg." Theodosios Decl. at ¶15 [Doc. No. 583]. Theodosios' statement about what Ms. Daly purportedly told him is inadmissible hearsay.

[9] On October 9, 2015, Liro and SMB Management filed a motion to dismiss. Doc. No. 38. On December 30, 2015, Liro and SMB Management joined Theodosios' and Harry's motion to strike the Complaint. Doc. No. 98. On April 29, 2016, Liro and SMB Management answered the Complaint. Doc. No. 222. On July 3, 2016, Liro and SMB Management filed an opposition to the Trustee's motion for an order confirming that Judge Shook could issue a contingent ruling in the arbitration without violating the Preliminary Injunction Order. Doc. No. 334. On August 23, 2016, Liro and SMB Management filed a motion for judgment on the pleadings. Doc. No. 347.

arguments contained in Theodosios' concurrently-filed motion to dismiss. Theodosios did not challenge Liro and SMB Management's capacity when they filed a joinder to Theodosios' motion to strike the complaint on December 30, 2015. He did not challenge their capacity on July 3, 2016, when Theodosios and SMB Management and Liro filed a joint opposition to a motion filed by Harry and Christine Roussos. Theodosios did not challenge SMB Management and Liro's capacity when he filed a motion for judgment on the pleadings on August 30, 2016, which incorporated verbatim all the arguments made in SMB Management and Liro's concurrently-filed motion for judgment on the pleadings.

Between June 10, 2016, and September 30, 2016, Daniel McCarthy, an experienced litigator, aggressively defended SMB Management and Liro. At no point during this period did Mr. McCarthy or Theodosios question SMB Management and Liro's capacity to participate in the litigation. In connection with his defense of SMB Management and Liro, McCarthy spent a significant time with working with Theodosios, who has extensive knowledge of SMB Management and Liro's operations. *See, e.g.*, Declaration of Daniel J. McCarthy at ¶17 [Doc. No. 319] (filed in support of Joint Opposition [of the Four Entities and Theodosios] to Motion of Plaintiff for an Order … Compelling Defendant Theodosios Roussos to Produce Documents) (stating that McCarthy worked with Theodosios for approximately ten hours on June 22 and June 23 to review documents to be produced by Theodosios and the Four Entities); *id.* at ¶26 (stating that McCarthy attended Theodosios' depositions on June 8 and 27, 2016); *id.* at ¶27 (stating that Theodosios was to be deposed as the person most knowledgeable for the Four Entities); *id.* at ¶28 (stating that McCarthy would work with Theodosios to facilitate the discovery obligations of the Four Entities).

Theodosios was happy to ignore SMB Management and Liro's capacity during the time that Mr. McCarthy aggressively defended SMB Management and Liro, in alignment with Theodosios' vehement opposition to any settlement.[10] During this entire period Theodosios, as the person most knowledgeable for SMB Management, Liro, and the other corporate entities, was working closely with Mr. McCarthy.

Only when Mr. McCarthy withdrew from representation, and the Four Entities entered into a settlement agreement in contravention of Theodosios' wishes, did Theodosios present the capacity argument. Theodosios' raising of the argument now is a bad-faith attempt to obstruct settlement and cause delay. Had Theodosios wished to challenge the capacity of SMB Management and Liro to participate, there were multiple occasions in the past in which he could have done so. By waiting to raise the issue until it was to his tactical advantage, Theodosios has waived his ability to challenge SMB Management and Liro's capacity.

---

[10] Theodosios' opposition to settlement is expressed in e-mails he sent to the Four Entities' managing director Sarah Daly. In a September 22, 2016 e-mail, Theodosios wrote: "I will pursue every available legal remedy against you no matter how long it takes if you continue to act against the best interests of the entities by … trying to sign a settlement agreement that you know you are not authorized to sign." Daly Decl. at Ex. B [Doc. No. 582]. In an October 1, 2016 e-mail, Theodosios wrote: "You are advised to scrap the illegal and unauthorized settlement now. YOU ARE RESPONSIBLE FOR ALL THE DAMAGES AND CONSEQUENCES." *Id.* at Ex. D.

*Id.* at 8–10.

Having rejected Theodosios' arguments in opposition to approval of the Settlement Agreement, the Court found that approval of the Settlement Agreement was appropriate under the standard set forth in *Martin v. Kane (In re A&C Properties)*, 784 F.2d 1377, 1381 (9th Cir. 1986). *A&C Properties* requires the Court to consider the following factors in "determining the fairness, reasonableness and adequacy of a proposed settlement agreement": "(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises." *A&C Properties*, 784 F.2d at 1381.

The Court found that all four of the *A&C Properties* factors weighed in favor of approving the Settlement Agreement. The Court observed that although the Trustee had a strong probability of succeeding in the litigation, any judgment the Trustee obtained would most likely be subject to a lengthy and costly appeal, whereas the costs of defending against an appeal of the approval of the Settlement Agreement would be less. With respect to the complexity of the litigation, the Court observed that a trial would be lengthy and expensive for the estate. With respect to difficulties in the matter of collection, the Court found that the Settlement Agreement enabled the Trustee to gain immediate possession of the Properties, greatly reducing the risks that the Properties could be damaged through a lack of proper management and maintenance.[11] Finally, the Court found that the Settlement Agreement was in the interests of creditors, as it would allow them to be paid in full.

On November 29, 2016, the Court entered an order finding that the Settling Defendants entered into the Settlement Agreement in good faith, within the meaning of California Code of Civil Procedure §877.6. *See* Order Approving Settling Defendants' Motion for a Determination that Settlement Agreement Was Entered Into in Good Faith Pursuant to California Code of Civil Procedure §877.6 ("Good-Faith Order") [Doc. No. 658]. The Court made the finding of good-faith for the following reasons:

> The settlement discussions were conducted at arms-length and were free of collusion. *See* Shenson Decl. at ¶2.[12] The absence of collusion is further demonstrated by the fact that Theodosios and Paula had the opportunity to enter into the Settlement Agreement on the same terms as Harry and Christine.
>
> The Settlement Agreement does not allocate a disproportionate share of liability on non-settling defendants Theodosios and Paula Roussos. The cost of the Settlement Agreement is born by the Four Entities, in which both Theodosios and Harry hold ownership interests. The only advantage that Harry and Christine obtain by entering the Settlement Agreement that is not available to non-settling defendants Theodosios and Paula is a limitation on the collection of Michaelides' Non-Dischargeable Judgment (a

---

[11] Issues concerning the Properties' management had arisen during the course of litigation. The Properties went without a management company for several months after the previous management company quit. Only after the Trustee filed a motion seeking to appoint a receiver to manage the Properties were the parties able to agree on the appointment of a new property management company.

[12] Theodosios alleges that Sarah Daly informed him that the Trustee introduced Lesnick to the Four Entities. Daly's alleged statement is inadmissible hearsay which the Court does not consider.

> judgment which Michaelides already holds against both Harry and Theodosios), and three to six months of rent-free living in the San Vicente Property. In view of the $11 million Settlement Amount, these advantages are relatively inconsequential.
>
> Recognizing that the burden of the Settlement Agreement falls equally upon Harry, Theodosios argues that the settlement is collusive because the Settlement Amount is too high. Theodosios argues that the real purpose of the Settlement Agreement is to provide the attorneys a windfall of fees. Theodosios' argument strains credulity. Harry and Christine were represented by competent counsel and freely entered into the Settlement Agreement. They would not have done so had they not believed that the Settlement Agreement was in their best interests. The concern that typically arises in the context of an §877 determination is that by settling for too little, the settling defendants have acted in collusion and prejudiced the non-settling parties. There is no support for Theodosios' novel theory that collusion may be shown if the defendants allegedly settle for too much.
>
> Theodosios' real issue is that he strongly believes that a better result for the Defendants could have been obtained had the matter proceeded to trial. But Theodosios' adamantine opposition to the Settlement Agreement does not show that the agreement was collusive, not in good faith, or in any way motivated by a desire to harm him.

Final Ruling on Motion to Determine Whether the Settlement Agreement was Entered Into in Good Faith [Doc. No. 645] at 8–9.

Theodosios now seeks a stay pending appeal of the Settlement Approval Order and Good-Faith Order. Theodosios restates the arguments he previously presented in opposition to entry of the Settlement Approval Order and Good-Faith Order, and argues that his appeals are likely to succeed on the merits. Theodosios contends that he will be irreparably harmed absent a stay because a sale of the Properties will render his appeal moot. Theodosios asserts that a delay in the sale will not harm the Trustee given the substantial equity in the Properties. The Trustee and Harry and Christine Roussos oppose issuance of a stay. The Trustee asserts that the potential mootness of Theodosios' appeals does not amount to irreparable harm. The Trustee argues that a delay of the sale will harm creditors, who will have to wait longer to receive their distributions. Harry and Christine Roussos assert that delay of the sale will harm them by increasing the amount of interest owed on the Settlement Amount.

## II. Findings and Conclusions

Pursuant to Bankruptcy Rule 8007(a)(1), the Court may issue a stay of a judgment, order, or decree pending appeal. In determining whether to grant a stay pending appeal, the Court considers the following four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 426 (2009).

As the Supreme Court has explained, a stay pending appeal

> "is not a matter of right, even if irreparable injury might otherwise result." *Virginian R. Co.,* 272 U.S., at 672, 47 S.Ct. 222. It is instead "an exercise of judicial discretion," and "[t]he propriety of its issue is dependent upon the circumstances of the particular case." *Id.,* at 672–673, 47 S.Ct. 222; see *Hilton, supra,* at 777, 107 S.Ct. 2113 ("[T]he traditional stay factors contemplate individualized judgments in each case"). The party

> requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion….
> The first two factors of the traditional standard are the most critical. It is not enough that the chance of success on the merits be "better than negligible." … By the same token, simply showing some "possibility of irreparable injury," *Abbassi v. INS,* 143 F.3d 513, 514 (C.A.9 1998), fails to satisfy the second factor.

*Id.* at 434–35.

To be entitled to a stay pending appeal, the moving party must make a "minimum permissible showing" with respect to each of the four factors. *Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011). Provided the moving party meets a minimum threshold as to each factor, the Court may "balance the various stay factors once they are established." *Id.* at 965. Under this balancing approach, a stronger showing of irreparable harm can offset a weaker showing of likelihood of success on the merits, and vice versa—provided that the minimum threshold with respect to each factor has been established. *Id.* at 965–66.

<u>Theodosios Has Not Made a Strong Showing That He is Likely to Succeed on the Merits</u>

As the Ninth Circuit has explained:

> The first showing a stay petitioner must make is "a strong showing that he is likely to succeed on the merits." *Id.* at 1761 (quoting *Hilton,* 481 U.S. at 776, 107 S.Ct. 2113) (quotation marks omitted). There is some uncertainty as to the exact degree of likely success that stay petitioners must show, due principally to the fact that courts routinely use different formulations to describe this element of the stay test. What is clear, however, is that to justify a stay, petitioners need not demonstrate that it is more likely than not that they will win on the merits….
> There are many ways to articulate the minimum quantum of likely success necessary to justify a stay—be it a "reasonable probability" or "fair prospect," as *Hollingsworth,* 130 S.Ct. at 710, suggests; "a substantial case on the merits," in *Hilton*'s words, 481 U.S. at 778, 107 S.Ct. 2113; or, as articulated in *Abbassi,* 143 F.3d at 514, that "serious legal questions are raised." We think these formulations are essentially interchangeable, and that none of them demand a showing that success is more likely than not. Regardless of how one expresses the requirement, the idea is that in order to justify a stay, a petitioner must show, at a minimum, that she has a substantial case for relief on the merits.

*Leiva-Perez*, 640 F.3d at 967–68.

The appellate court reviews the Bankruptcy Court's decision to approve the Settlement Agreement under the "abuse of discretion" standard. *Goodwin v. Mickey Thompson Entm't Grp., Inc. (In re Mickey Thompson Entm't Grp., Inc.)*, 292 B.R. 415, 420 (B.A.P. 9th Cir. 2003). The Ninth Circuit Bankruptcy Appellate Panel describes the "abuse of discretion" standard as follows:

> Under this highly deferential standard of review, we first "determine de novo whether the [bankruptcy] court identified the correct legal rule to apply to the relief requested." *United States v. Hinkson,* 585 F.3d 1247, 1262 (9th Cir.2009) (en banc). And if the bankruptcy court identified the correct legal rule, we then determine under the clearly erroneous standard whether its factual findings and its application of the facts to the relevant law were: "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id.* (internal quotation marks omitted).

*Heritage Pacific Financial, LLC v. Machuca (In re Machuca)*, 483 B.R. 726, 736 (B.A.P. 9th Cir. 2012).

In support of his contention that he is likely to succeed on the merits, Theodosios reiterates the arguments he originally presented in opposition to approval of the Settlement Agreement and in opposition to entry of the Good-Faith Order. As discussed above, the Court considered, and rejected, each of Theodosios' arguments, and explained its reasoning in detailed rulings. Theodosios has not presented argument or evidence sufficient to establish that the Court applied the incorrect legal rule, or that the Court's findings were illogical, implausible, or without support from the factual record. In view of the deferential standard of review applied to motions to approve compromise agreements, Theodosios has failed to show either that his appeals are likely to succeed on the merits, or that his appeals raise substantial legal issues.

The Court further notes that regardless of Theodosios' likelihood of succeeding on appeal, his request for a stay is doomed by his failure to show irreparable harm. As discussed below, a stay may not be issued absent a showing of irreparable harm.

Theodosios Has Not Shown That He Will Be Irreparably Harmed Absent a Stay

To obtain a stay pending appeal, Theodosios must show that "irreparable harm is probable if the stay is not granted." *Leiva-Perez*, 640 F.3d at 968. Theodosios' burden "with regard to irreparable harm is higher than it is on the likelihood of success prong"; Theodosios must show "that an irreparable injury is the more probable or likely outcome." *Id.*

Theodosios has not demonstrated that he will be irreparably harmed absent a stay. Theodosios argues that he will be irreparably harmed because the Trustee's upcoming sale of the Properties will divest him of his interest in the Properties and render his appeal moot. "The law is clear in the Ninth Circuit that 'irreparable injury cannot be shown solely from the possibility that an appeal may be moot.'" *In re Red Mountain Mach. Co.*, 451 B.R. 897, 908–09 (Bankr. D. Ariz. 2011). Theodosios' argument that he will be irreparably harmed by sale of the Properties is further undercut by Judge Shook's decision in the binding arbitration to which Theodosios voluntarily submitted. The Arbitrator's Decision provides that the Properties are to be marketed and sold, and specifies that the sale must occur even if the voting requirements of the Partnership Agreements are not satisfied. Therefore, regardless of the outcome of the appeal, the Properties will be sold—either pursuant to the Settlement Agreement or pursuant to the Arbitrator's Decision.

It is true that if the Properties were sold pursuant to the Arbitrator's Decision rather than pursuant to the Settlement Agreement, the distribution of the sale proceeds would be different. A sale pursuant to the Arbitrator's Decision would result in entities in which Theodosios holds an interest receiving a greater proportion of the sales proceeds. However, this fact only underscores the absence of irreparable harm. It shows that the principal injury to Theodosios absent a stay is economic—namely, that Theodosios or the entities in which he holds an interest will receive less of the sales proceeds. As the Ninth Circuit has held, "economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). Accordingly, Theodosios cannot maintain that sale of the Properties constitutes irreparable harm.

Other Parties Would Be Injured By a Stay

Issuance of the stay would substantially injure other parties to the proceeding, in particular Harry and Christine Roussos. Under the terms of the Settlement Agreement, annual interest of

10% on the $11 million Settlement Amount—for which Harry's estate is liable—begins to accrue on March 1, 2017. To the extent that interest increases the Settlement Amount, the surplus distribution payable under the Settlement Agreement to Harry or to entities in which Harry and Christine hold an interest will be reduced. Further delay will also injure creditors of the estates of Harry and Theodosios, who will have to wait longer in order to receive a distribution on their claims.

A Stay is Not in the Public Interest

"There is a great public interest in the efficient administration of the bankruptcy system." *Adelson v. Smith (In re Smith)*, 397 B.R. 134, 148 (Bankr. D. Nev. 2008). The jointly-administered bankruptcy cases of Harry and Theodosios Roussos were converted to Chapter 7 on May 2, 1995. Creditors' claims have remained unsatisfied for more than twenty years. Further delay of the administration of the estates is not in the public interest.

Conclusion

Based upon the foregoing, Theodosios' motion for a stay pending appeal of the Settlement Approval Order and the Good-Faith Order is DENIED. The Court will enter an order consistent with this Memorandum of Decision.

###

Date: February 1, 2017

_____
Ernest M. Robles
United States Bankruptcy Judge